**WASHINGTON LEGAL FOUNDATION, et al., Appellants,**

v.

**Lamar ALEXANDER, Secretary of Education, et al., Appellees.**

No. 92–5005.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 11, 1992.

Decided Feb. 5, 1993.

**484**

Richard A. Samp, Washington, DC, with whom Daniel J. Popeo, New Hartford, NY, was on the brief, for appellants.

Thomas M. Bondy, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty. and Michael Jay Singer, Atty., Dept. of Justice, Washington, DC, were on the brief, for appellees.

Before: EDWARDS, BUCKLEY and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

The Washington Legal Foundation ("WLF") and seven individuals (collectively, "appellants") appeal a District Court order dismissing their action against the Secretary and the Assistant Secretary of Education. Appellants allege that the Department of Education ("DOE") has violated Title VI of the Civil Rights Act of 1964[1] by providing federal funds to educational institutions that offer some scholarships only to minority students. In the District Court, appellants sought an injunction compelling DOE to issue and enforce new regulations under Title VI that prohibit such scholarships. The District Court dismissed the suit, holding, in part, that appellants had no cause of action against the Government under the Administrative Procedure Act ("APA"), because an adequate alternative remedy existed—a suit directly against the institutions administering the allegedly unlawful scholarships. We affirm the District Court.

## I. BACKGROUND

Title VI of the Civil Rights Act of 1964 prohibits discrimination in federally assisted programs. Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (1988). Section 602 "authorize[s] and direct[s]" each federal agency that is empowered to distribute federal funds to "effectuate" the antidiscrimination mandate of Title VI by issuing "rules, regulations, or orders" consistent with Title VI. 42 U.S.C. § 2000d–1 (1988). Title VI instructs agencies to ensure compliance by aid recipients first through a system of voluntary adherence, and then, if necessary, by initiating a process leading to the termination of federal funding. *See id.; see also Women's Equity Action League v. Cavazos*, 906 F.2d 742, 745 (D.C.Cir.1990) (*"WEAL"*).

DOE's current regulations effectuating Title VI have been in force since 1980. *See* 34 C.F.R. §§ 100.1–.13 (1992). The regulations do not address so-called "minority scholarships" as such, but some guidance is found in the present policy on affirmative action:

(i) In administering a program regarding which the recipient has previously discriminated against persons on the ground of race, color, or national origin,

---

1. 42 U.S.C. §§ 2000d *et seq.* (1988).

the recipient must take affirmative action to overcome the effects of prior discrimination.

(ii) Even in the absence of such prior discrimination, a recipient in administering a program may take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, or national origin.

34 C.F.R. § 100.3(b)(6) (1992). Under these regulations, various colleges and universities allegedly offer some scholarships only to students of certain races.[2]

This appeal arises out of a complaint that appellants filed against DOE after it withdrew a proposed change in policy on minority scholarships. On December 4, 1990, an official at DOE's Office of Civil Rights ("OCR") declared that Title VI categorically prohibited colleges and universities from awarding scholarships on the basis of race. Two weeks later, however, OCR issued a press release announcing a substantially more tolerant policy on minority scholarships.[3] On March 20, 1991, Secretary of Education Lamar Alexander (the "Secretary") announced in a press conference that he had withdrawn both policy statements, and indicated that DOE would continue to interpret Title VI as permitting federally funded institutions to provide minority scholarships. DOE later issued, on December 10, 1991, a *Proposed Policy Guidance* on Title VI's applicability to scholarship awards based on race or national origin.[4] The *Proposed Policy Guidance* suggested that DOE would continue to interpret Title VI as permitting race-based scholarships in a variety of instances. Sub-sequently, several members of Congress informed DOE that the General Accounting Office ("GAO") was undertaking a study of the proposed DOE policy. Upon request of those members of Congress, DOE has deferred final issuance of its updated policy on minority scholarships.[5]

On March 21, 1991, immediately following the Secretary's press conference, WLF, a non-profit law and policy center, and seven white college and law students filed this action in District Court. Appellants alleged that they had suffered race discrimination in violation of Title VI because the federally-funded institutions they attended offered some scholarships only to minority students. Appellants prayed for a declaratory judgment that Title VI prohibits federally-funded colleges from offering minority scholarships, and an injunction requiring DOE to issue and enforce regulations to that effect.

The District Court dismissed appellants' claims. *Washington Legal Found. v. Alexander*, 778 F.Supp. 67 (D.D.C.1991). Following our decision in *WEAL*, the District Court held that the APA does not provide appellants a cause of action against the Government because a person suffering discrimination by a college or university in violation of Title VI has an adequate alternative remedy—a right of action directly against the discriminating institution under Title VI itself.[6] *Id.* at 70. Appellants then filed this appeal.

.II. DISCUSSION

In their brief, appellants seem to raise two separate arguments before this court,

---

2. *See Nondiscrimination in Federally Assisted Programs; Title VI of the Civil Rights Act of 1964; Proposed Policy Guidance,* 56 Fed.Reg. 64,548 (1991) ("*Proposed Policy Guidance*") (noting study by the American Council on Education indicating that 45,000 minority students at four-year colleges receive "race-exclusive scholarships").

3. *See* DOE Press Release, "Department Issues Policy Statement on Race–Exclusive Scholarships" (Dec. 18, 1990), *reprinted in* Joint Appendix ("J.A.") 23.

4. *See* note 2 *supra.*

5. *See* Letter from Lamar Alexander, Secretary of Education, to Senator Paul Simon (June 10, 1992), *reprinted in* Brief for Appellants, Addenda ("DOE Letter") (agreeing to "defer issuing the final policy guidance on race-exclusive financial aid until after the General Accounting Office finishes its study....").

6. The District Court also held that appellants could not obtain relief against DOE under either Title VI or the Mandamus Act, 28 U.S.C. § 1361 (1988). *Id.* at 69, 72. Appellants do not seek review of these parts of the District Court's decision.

based on mutually exclusive premises. First, appellants appear to assert that they have an APA cause of action against DOE by virtue of the alleged discrimination by the cited institutions against the seven named students, who state that they are unable to obtain any of the scholarship funds reserved solely for minorities. This claim rests on the view that DOE in fact *has* a policy against minority scholarships, but has failed to enforce that prohibition against the specific schools that appellants attend. Second, appellants contend further that they have an APA cause of action against DOE because it has abdicated its responsibility to enforce Title VI. This claim presupposes that DOE has no policy prohibiting minority scholarships. Frankly, we are not sure whether appellants mean to advance these mutually exclusive claims, so we will address both contentions. On the record before us, we reject both of these arguments and affirm the District Court's dismissal.

### A. *Alleged Discrimination by the Individual Institutions*

■ Appellants allege that the seven named students have been discriminated against in violation of Title VI, because the schools that they attend offer some scholarships only to minority students (to the exclusion of appellants). On the basis of this allegation, appellants claim to have a cause of action under the APA to compel DOE to enforce Title VI. *See* 5 U.S.C. § 702 (1988) (authorizing suits against Government agencies for relief other than money damages). This claim must fail, because a suit under section 702 is available only where "there is no other adequate remedy in a court...." 5 U.S.C. § 704 (1988). Under our decision in *WEAL*, an adequate remedy is available to appellants, and we therefore conclude that appellants have no cause of action under the APA for the discrimination alleged.

This court's decision in *WEAL* marked the endpoint of twenty years of litigation over discrimination committed by a number of federally-funded educational institutions. The plaintiffs in *WEAL* brought suit against DOE seeking "across-the-board continuing federal court supervision of the

process by which [Government] agencies ensure compliance with the antidiscrimination mandates" of Title VI. 906 F.2d at 748. The court held that plaintiffs had no cause of action against DOE under the APA, because an adequate alternative remedy was available to them. The court noted that, under the Supreme Court's decision in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), plaintiffs had an implied right of action under Title VI against the specific institutions that had committed the alleged discrimination. *See WEAL,* 906 F.2d at 750. Following our *en banc* decision in *Council of and for the Blind v. Regan,* 709 F.2d 1521, 1531–33 (D.C.Cir.1983) (en banc), the court in *WEAL* deemed this right of action an "adequate" remedy to redress the discrimination suffered by plaintiffs and "therefore preclusive of a default remedy under the APA." 906 F.2d at 751; *see* 5 U.S.C. § 704.

*WEAL* controls the disposition of this case. Appellants concede that they have an implied right of action under Title VI against the individual colleges and law schools to redress any discrimination they have allegedly suffered. As in *WEAL,* that alternative remedy operates in this case, by force of 5 U.S.C. § 704, to preclude a remedy under the APA. *See also Coker v. Sullivan,* 902 F.2d 84, 90 n. 5 (D.C.Cir.1990) (noting that *Council of and for the Blind* interpreted the APA " 'to bar suits where a plaintiff's *injury* may be remedied in another action, even if that remedy would have no effect upon the challenged agency action' ") (citation omitted). Moreover, in the words of the *WEAL* court, "*Cannon* suggests that Congress considered private suits to end discrimination not merely adequate but in fact the *proper* means for individuals to enforce Title VI...." 906 F.2d at 751 (emphasis added). Appellants are therefore left to their alternative remedy, and may pursue actions under Title VI against their respective individual institutions.

### B. *Alleged Abdication by DOE*

■ Appellants argue that their injury is not solely attributable to the purported discrimination by the institutions they attend,

but is "exacerbated" by DOE.[7] Relying on our decision in *Adams v. Richardson*, 480 F.2d 1159 (D.C.Cir.1973) (en banc), appellants maintain that they have an APA cause of action against DOE because it has engaged in "total abdication of its Title VI enforcement responsibilities...."[8] This argument is meritless.

In *Adams*, the forerunner to *WEAL*, Black students, citizens and taxpayers charged that the Secretary of Health, Education and Welfare ("HEW") (DOE's predecessor) had engaged in a "conscious policy of nonenforcement" of Title VI. *WEAL*, 906 F.2d at 751 n. 13. The District Court in *Adams* granted the plaintiffs' requests for declaratory and injunctive relief, holding that HEW had a duty to begin enforcement proceedings "having once determined that [various] state system[s] of higher education [and school districts were] in violation of Title VI, and having failed during a substantial period of time to achieve voluntary compliance...." *Adams v. Richardson*, 356 F.Supp. 92, 94–95 (D.D.C.1973). This court, sitting *en banc*, affirmed the District Court's order in principal part. *See Adams*, 480 F.2d at 1164.

The parties are sharply divided in their views of how *Adams* affects this action. Appellants read *Adams* as holding that the APA provides a cause of action against an agency charged with enforcing Title VI where the complainant alleges that the agency "has consciously and expressly adopted a general policy which is in effect an abdication of its statutory duty." 480 F.2d at 1162. Appellants contend that this holding was left intact by the *WEAL* court, because the *WEAL* decision precluding an APA action against DOE involved only "the *manner* in which DOE was carrying out its enforcement responsibilities,"[9] and did not include an allegation of "a conscious policy of *non*enforcement" of Title

VI. *WEAL*, 906 F.2d at 751 n. 13 (emphasis added). Appellants believe *Adams* is indistinguishable from the present action, because appellants have charged DOE with abdicating its statutory duty to enforce Title VI.

DOE, however, maintains that *Adams* is inapplicable to this action because—as we noted in *WEAL*—*Adams* "did not treat the question whether an APA action might be precluded [under 5 U.S.C. § 704] by reason of the availability of another adequate remedy." *WEAL*, 906 F.2d at 746. Indeed, neither the District Court's opinion nor this court's opinion in *Adams* even mentions section 704.[10] Our decision in *Adams* held only that HEW's enforcement of Title VI was not "committed to agency discretion by law" within the meaning of 5 U.S.C. § 701(a)(2) (1988). *See Adams*, 480 F.2d at 1161–63. As DOE points out, in the years since *Adams* was decided, this court has expressly addressed and affirmed the availability of an adequate alternative remedy in the form of an implied right of action under Title VI. *See WEAL*, 906 F.2d at 750–51. DOE contends that since such an action is available here, appellants have no APA cause of action, despite appellants' assertion that they, like the *Adams* plaintiffs, are alleging a "conscious policy of nonenforcement."

It is unnecessary for us to decide here whether an APA suit against DOE is always precluded, by virtue of an adequate alternative remedy, in a case involving a "conscious policy of nonenforcement." In *Adams*, as the District Court emphasized, HEW made *express findings* that certain states and school districts were in violation of Title VI, and yet those states and school districts continued to receive "substantial" federal assistance from HEW. *Adams*, 356 F.Supp. at 94–95; *see also Adams*, 480 F.2d at 1164. The availability of the APA

7. Brief for Appellants at 13.

8. Brief for Appellants at 13.

9. Brief for Appellants at 19 (emphasis added).

10. As the court stated in *WEAL*,

[t]he lack of reference [in *Adams* to the section 704 preclusion] question in 1973 is not

surprising. The Supreme Court did not explicitly endorse a private right of action against discriminating institutions receiving federal funds until its 1979 *Cannon* decision.... Moreover, *Council of and for the Blind*, which homed in on and elucidated APA section 704's inapplicability to plaintiffs who possess other adequate remedies, was not decided until 1983.

906 F.2d at 746 n. 3.

injunction suit in *Adams* was thus premised in part on the fact that HEW itself had determined that certain educational institutions were in violation of Title VI, and had nevertheless taken no action against them. In contrast, appellants here make no claim that DOE has found any federally funded institution to be in violation of Title VI on the basis of its minority scholarship program. Thus, unlike *Adams,* this case does not involve an injunction requiring the agency to "enforce its own determination that educational institutions have discriminated in violation of Title VI." *Washington Legal Found.,* 778 F.Supp. at 70. Accordingly, assuming without deciding that an *Adams* abdication action might still be available under the APA after our decision in *WEAL,* such an action is not available to appellants in this case.

■ We note, finally, that it is possible to read appellants' initial complaint, as well as the brief they filed with this court, as stating a claim of unreasonable agency delay with respect to DOE's failure, as of yet, to issue its new minority scholarship policy in final form. *See generally Telecommunications Research and Action Ctr. v. FCC,* 750 F.2d 70, 79–80 (D.C.Cir.1984) (discussing claim of unreasonable agency delay). In their complaint, appellants charge that DOE has failed to issue any policy or regulations "to effectuate Title VI's prohibition against racial discrimination in the award of college scholarships...."[11] Similarly, in their brief filed with this court, appellants contend that DOE has "delay[ed] indefinitely its issuance of a new policy...."[12]

The record reveals no unreasonable delay. To begin with, DOE has operated since its founding in 1980 on the assumption that its regulations on affirmative action sufficiently address the issue of minority scholarships. *See* 34 C.F.R. § 100.-3(b)(6). Indeed, DOE "has received fewer than a dozen complaints or inquiries that have addressed the permissibility of race-exclusive scholarships."[13] Furthermore, the record does not indicate—nor do appellants allege—that, prior to this action, anyone has brought suit to force DOE to issue a more detailed or different policy on minority scholarships under Title VI.

More recently, DOE has decided to give the issue of minority scholarships extended consideration, as reflected in the December 1991 *Proposed Policy Guidance.* DOE initially expressed its intention to issue a final policy by March 9, 1992.[14] However, on June 10, 1992, the Secretary agreed, in response to requests by members of Congress, to delay issuance of any policy until the completion of a GAO study.[15] The Secretary nevertheless expressed concern that "GAO ... move as rapidly as possible," because "it is important to move promptly to provide advice to colleges and universities on this subject."[16] Under our precedent, the relatively brief period that has passed hardly qualifies as unreasonable agency delay. *See, e.g., Community Nutrition Inst. v. Young,* 773 F.2d 1356, 1361 (D.C.Cir.1985), *cert. denied,* 475 U.S. 1123, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986) ("While there is no absolute definition of what is a reasonable time, we know that it may encompass 'months, occasionally a year or two, but not several years or a decade.'") (quoting *MCI Telecommunications Corp. v. FCC,* 627 F.2d 322, 340 (D.C.Cir.1980)). DOE has been reasonable in its solicitude for the concerns of Congress, while at the same time making it clear that a policy will be issued as soon as possible.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the District Court.

*So Ordered.*

---

11. Complaint at 13, *reprinted in* J.A. 17.

12. Brief for Appellants at 19.

13. *Proposed Policy Guidance,* 56 Fed.Reg. at 64,-548.

14. *See id.*

15. *See* DOE Letter, *supra* note 5.

16. *Id.*